UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION
_____

| | | |
|---|---|---|
| KEVIN SCOTT REX, | : | |
| | : | |
| Plaintiff, | : | NO. 4:07-CV-00174-REL-CFB |
| | : | |
| vs. | : | |
| | : | REPORT AND RECOMMENDATION |
| VICTOR MUNOZ, | : | ON DEFENDANTS' MOTION |
| | : | FOR SUMMARY JUDGMENT |
| Defendant. | : | |

_____

This matter comes before the Court on the Motion for Summary Judgment (Clerk's No. 20), filed October 23, 2008, by Defendant, Victor Munoz, and former defendants, Two Unidentified Polk County Sheriff's Deputies.[1] Plaintiff, Kevin Rex, filed a Complaint under 42 U.S.C. § 1983, alleging that the two unidentified deputies used excessive force against him when he was booked into Polk County Jail on November 7, 2006. Rex further alleges that Munoz, who is a Major with the Polk County Sheriff's Department and the jail's Division Commander, violated his constitutional rights in the manner in which he responded to Rex's request for medical attention and processed Rex's grievance concerning the alleged excessive force and

---

[1] On July 31, 2008, the Court dismissed the claims against the Two Unidentified Polk County Sheriff's Deputies without prejudice, leaving Munoz as the only named defendant (Clerk's No. 16). Defendant, nevertheless, filed the Motion for Summary Judgment "on behalf of all possible Defendants, named and unnamed, with the thought that all possible Defendants would be before the Court before the dispositive motion deadline would expire." (Clerk's No. 26 at ¶ 2.) In his resistance, Rex identified one of the previously unidentified Polk County Sheriff's Deputies as Sgt. Brent Long. (Mem. Supp. Pl.'s Res. Def.'s Mot. Summ. J. at 6.) Attempting to amend the Complaint in the dispositive motion is not permissible under the Federal Rules of Civil Procedure. However, because Rex could seek to amend his Complaint after this Report and Recommendation is filed, the Court will analyze Defendant's motion in relation to Rex's previous claims against Long as an unidentified Polk County Sheriff Deputy. This approach does not prejudice Munoz or Long, because the Motion for Summary Judgment was filed "on behalf of all possible Defendants, named and unnamed." (Clerk's No. 26 at ¶ 2.)

1

medical needs.  Rex sued Munoz only in his individual capacity.  (*See* 2d Am. Compl. at ¶¶ 6-7, Clerk's No. 12.)[2]  Rex seeks actual and exemplary damages, attorney fees, and costs.

Munoz asserts he is entitled to summary judgment because no genuine issue of material fact is in dispute and he is entitled to judgment as a matter of law.  Munoz also asserts qualified immunity as an affirmative defense.

On October 22, 2008, this case was referred to the undersigned for a Report and Recommendation under 28 U.S.C. § 636(b)(1)(B).  The Court extended Rex's time to respond to Defendant's Motion for Summary Judgment three times.  (Clerk's Nos. 24, 25, 29.)  On February 10, 2009, Rex filed a resistance to Defendant's motion.  (Clerk's No. 30.)  On March 6, 2009, Munoz filed a reply to Rex's resistance.  (Clerk's No. 33.)  The Court considers this matter fully submitted.  After carefully considering the summary judgment record, the Court finds and recommends as follows on the issues presented.

## STANDARD FOR MOTION FOR SUMMARY JUDGMENT

In determining whether to grant a moving party's motion for summary judgment, a court must first examine the record to see whether the moving party, "in depositions, answers to interrogatories, admissions, affidavits and the like, has demonstrated 'the absence of a genuine issue of material fact'" and "entitlement to judgment as a matter of law."  *Beard v. Banks*, 548 U.S. 521, 529 (2006) (citing Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).  If the record shows the moving party has met its initial burden, the court must next determine whether the nonmoving party has, "'by affidavits or as otherwise provided' in Rule 56 (*e.g.*, through depositions, etc.) 'set forth specific facts showing that there is a genuine issue for trial.'"  *Id.* (quoting Rule 56(e) (emphasis deleted)).  If the nonmoving party does not meet its burden, the court must enter judgment in favor of the moving party.  *Id.*; *Buboltz v. Residential Advantages, Inc.,* 523 F.3d 864, 868 (8th Cir. 2008).

A court must view disputed facts and reasonable inferences in the light most favorable to the non-moving party, but only if a genuine dispute exists as to those facts.  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  The presence of "*some* alleged factual dispute between the parties will not

---

[2] Rex captions his Second Amended Complaint as "Complaint."  (Clerk's No. 12.) However, because this is his Second Amended Complaint, that is how the Court will refer to it.

2

defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). Where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," no genuine issue for trial exists; the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.*; *accord Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248).

When "opposing parties tell two different stories," one of which the record blatantly contradicts, "so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380 (determining that with regard to whether respondent, who alleged deputy used excessive force in terminating a high-speed chase of respondent's car, was driving in a manner that endangered human life, the Court of Appeals should have viewed the facts in the light depicted by the videotape of the car chase, where "Respondent's version of events is so utterly discredited" by the record that no reasonable jury could have believed him); *see Marvin v. City of Taylor*, 509 F.3d 234, 239 (6th Cir. 2007) (stating, when parties disputed what the video documenting most of the plaintiff's jail experience actually depicted, the court would view the events in the light most favorable to the nonmoving party, but "never in such a manner that is wholly unsupportable – in the view of any reasonable jury – by the video recording"; where the non-movant's version of the facts could "not be countenanced based upon what the video shows, this Court will adopt the video as fact" rather than the non-movant's version); *see also Reed v. City of St. Charles, Missouri*, 561 F.3d 788, 790-92 (8th Cir. 2009) (stating that when viewing facts in light most favorable to nonmovant, a court is not required to "accept unreasonable inferences or sheer speculation as fact," but rather nonmovant must "substantiate his allegations with sufficient probative evidence that would permit a finding in his favor . . . without resort to speculation, conjecture, or fantasy"; concluding that the plaintiff's claim that officer struck him with metal flashlight, rendering him unconscious, was directly discredited by the record) (internal citations and quotations omitted).

Here, as in *Scott*, there is "an added wrinkle," the "existence in the record of a videotape capturing the events in question." *Scott*, 550 U.S. at 379. Here, too, the record contains "no

allegations or indications that this videotape has been doctored or altered in any way, nor any contention that what it depicts differs from what actually happened," and the video "quite clearly contradicts the version of the story told by" the nonmovant. *Id.* Accordingly, to the extent the opposing parties tell two contradictory stories, one of which the record, including the video, blatantly contradicts, so that no reasonable jury could believe it, the Court will not adopt that version of the facts. *See id.* at 381.

## BACKGROUND

With the above principles in mind, the Court considers the following facts, which are either undisputed or, unless otherwise indicated, viewed in the light most favorable to Rex, the non-moving party. Early in the morning of November 7, 2006, Des Moines police officers arrested Rex and eight other people during a house raid. At approximately 3 a.m., officers took the arrestees to Polk County Jail. In the jail's booking area, an officer began questioning Rex and filling out a form. The two were standing. Rex's hands were cuffed behind his back. Rex, then 43-years-old, weighed approximately 170 pounds and was 5'8" tall. Nearby, two other arrestees stood answering booking questions from officers. Sgt. Brent Long was observing the booking process. Munoz was not present.

The opposing parties tell two different stories concerning what happened next. Defendant contends, "Plaintiff Rex continued his non-compliant behavior and began yelling in Sgt. Long's face and spitting on Sgt. Long"; "Plaintiff Rex was told to turn around and face the green wall pad"; "Plaintiff Rex did not do as instructed at which time Sgt. Long took his arms and turned Defendant's body toward the pad. Defendant attempted to pull away and turn around"; and "Plaintiff Rex made an apparent attempt to head butt Sgt. Long at which time Sgt. Long redirected the Defendant to the ground." (Def.'s Statement Mat. Facts at ¶¶ 5-8.) Rex disputes these facts and further states, "The officer squeezed Mr. Rex's shoulder causing a large bruise. Then the officer flipped Mr. Rex into the air and slammed" him onto the floor. (Statement Disputed and Undisputed Facts Supp. Res. Summ. J. at ¶ 4.) Rex asserts he "landed on his head and shoulder and received further blows from the defendants including twisting and pummeling of his extremities." *Id.*

In support of Defendant Munoz's factual description of the incident, he supplied Long's affidavit, in which the officer described the incident as follows:

> Rex was not being compliant with the deputy trying to do a medical screen of him and when I intervened to get his attention he was belligerent demanding to see the supervisor. Even after I told him that I was the supervisor, he kept talking and spitting while speaking. That is why I caused him to be placed away from me. When he was being held against the pat down pad, he did come off the pad twice with his head jerking back towards me even though I was holding him. Having been head butted by other inmates in handcuffs before in the same situation (and witnessed it done to others many times) my reaction was to avoid getting hit and get control over him. I took him to the floor in response to what I thought was an attempt to headbutt me. After going to the floor he was compliant and nothing further was needed to control him. Contrary to what he has said in letters to the Sheriff, I did not try to put my weight on him when we went to the floor and he was not roughed up on the floor by me or anyone else. Nor was he picked up by the cuffs or lose [sic] consciousness as he was talking through the entire incident.

Long Aff., Def.'s App. at 244-45. Similarly, in Long's November 7, 2006, incident report, he wrote the following:

> Rex . . . was very belligerent upon entering the facility. He continued with his abusive and noncompliant statements. I went out and addressed inmate Rex, and explained that he needed to listen to the officer and answer his questions. Rex continued to be non-compliant and began yelling into my face, and thus spitting on me as he talked. I told Rex to turn and face the green pad, he did not and I took his arms and turned his body towards to [sic] the mat. Rex attempted to pull his arms away from me, and began to directly threaten me. I began to hold Rex against the pad, as he on several occasions attempted to pull away and turn around. Rex, [sic] made a movement in an attempt to head but [sic] me, I stepped back, and redirected Rex to the ground. He was assisted to his feet and escorted to cell 142.

Def.'s App. at 247.

In support of his contrasting version presented in his Statement of Disputed and Undisputed Facts, Rex testified in his affidavit as follows:

> [Long] took it upon himself to assume that plaintiff was being difficult as he show-boated in front of witnesses. . . .[Long] pressed me against the wall with his hand gripped and pressed forcefully pressing down, threatening me. I had no other place to go but down or backwards . . . . The plaintiff had felt the extreme pressure and the plaintiff stumbled back while the officer's hands left finger marks in the plaintiff's right shoulder. Plaintiff stumbled back as then [Long] performed an unnatural act by using (his) force and not my own to flip the plaintiff into the air off his feet and slam him to the floor. Plaintiff landed directly on the right side of his head and right shoulder as then the Deputy and [Long] continued to work the plaintiff over on the floor contorting his body and inflicting

5

> pain as the force to the floor threw my back out of place with the additional violence. [Long] used his knee for a weapon to inflict additional force pressing down on the plaintiff's lower back smashing plaintiff's colon . . . . Then at the same time [Long] placed his arm around the plaintiff's head pulling the head backwards while the Deputy began twisting the left arm and wrist over, over extending the elbow and wrist unnaturally as plaintiff could not lift a phone book afterwards and still has problems with his left arm.

Rex Aff. at 1-2 (alterations added).

Defendant submitted two security camera videos showing Rex's booking at the Polk County Jail. The videos, labeled "South Booking" "South Pat Down," each captured from a different vantage point the entire incident from which Rex's excessive force claim arose.

The Court has viewed the videos, which show the following events. Rex, handcuffed, entered the booking area and walked over to the green wall pad where an officer began questioning him and writing his answers. (Ex. 2, "South Booking" at 396-439[3], "South Pat Down" at 435-54.) Long entered the room and stood facing the arrestees, observing the booking process. After the booking officer asked Rex about his education, Rex began telling the officer that he had been honorably discharged. Long walked toward Rex, stood in front of him, told him to answer the questions, and said he did not care about Rex's history. Rex and Long spoke to each other, and then Long turned Rex around to face the wall, telling the arrestee not to spit on him when answering. Long put his right hand on top of Rex's left shoulder. *Id.*, "South Booking" at 708-20; "South Pat Down" at 860-80. Long was not pressing Rex's shoulder forcefully; rather, the officer stood relatively relaxed, with his left hand resting on his hip and his attention directed to the booking officer. *Id.* When Rex began to turn toward his left, Long turned his face toward Rex, placed his right arm around the arrestee's neck and his left arm under Rex's left armpit and guided Rex to the ground. *Id.*, "South Booking" at 725-38; "South Pat Down" at 874-90. Rex landed on the right side of his body and rolled to his stomach. *Id.*, "South Booking" at 736-46; "South Pat Down" at 893-95. The video did not show Long or anyone flipping Rex into the air. *See id.* On the floor, Long positioned himself so that he was kneeling over Rex, straddling his body. *Id.*, "South Booking" at 747; "South Pat Down" at 897-

---

[3] Each frame has a number in the right corner.

900. Contrary to Rex's version, the videos do not show that Rex received "further blows from the defendants including twisting and pummeling of his extremities," nor that "the Deputy and [Long] continued to work the plaintiff over on the floor contorting his body," nor that Long "used his knee for a weapon to inflict additional force pressing" on Rex's back, nor that Long "placed his arm around the plaintiff's head pulling the head backwards while the Deputy began twisting the left arm and wrist." (*See* Rex Aff. at 1-2; Statement Disputed and Undisputed Facts Supp. Res. Summ. J. at ¶ 4.) Once Rex and Long were on the floor, Long asked Rex, "Are you done now?," to which Rex replied, "yes, Sir." *Id.*, "South Booking" at 756; "South Pat Down" at 900-10. Rex agreed to not "turn on" Long again. *Id.*, "South Booking" at 760-61; "South Pat Down" at 915-24. Officers helped Rex to his feet by grasping his arms, not the handcuffs, and led him back to the wall pad. Only twelve seconds passed from the time Long began to take Rex to the floor to the time that officers began helping Rex to his feet and Long got up. The videos show that until the officers helped Rex to his feet, no officer except Long touched Rex while he was on the floor. After officers escorted Rex back to the wall, an officer removed Rex's handcuffs and conducted a pat down search of the arrestee. *Id.*, "South Booking" at 1000-41; "South Pat Down" at 1210-1380. Rex removed his shoes, ring, and necklace; Long photographed Rex; and Rex left the booking area. *Id.*, "South Booking" at 1330-1750; "South Pat Down" at 1618-2097.

   According to Long's incident report, he "took pictures of Rex, and requested medical to see Rex at [their] earliest convenience." (Def.'s App. at 247 (alteration added).) Rex contends that after his picture was taken, "as time went on swelling and visual problems became constant hours later." (Rex Aff. at 2.)

   An officer escorted Rex to the jail's medical office, where a registered nurse, Plamke, interviewed him and completed a medical history and screening form at 3:55 a.m. According to the nurse's medical notes, when she asked Rex if he had fainted or had a head injury within the past six months, he responded that he had been "punched in head approx[imately] 2 months ago." (Def.'s App. at 132 (alteration added).) Rex told the nurse, "I was slammed against the wall by the officer." *Id.* at 133. He was complaining of pain to his head, neck, and right shoulder, according to Tania Porter, a jail nurse manager. (Porter Aff. at 1.) Nurse Plamke noted on the medical screening form that Rex had a "reddened" swollen area above his right

eyebrow, but there was no active bleeding. *Id.* She stated Rex's range of motion was "intact" to his right shoulder. *Id.* The nurse wrote that Rex "refuses to cooperate [with] this RN [at] this time." (Def.'s App. at 133 (alterations added).) The screening form indicated the nurse did not refer Rex to the emergency room, to a doctor, or to sick call. Rex testified that the nurse said, "there is nothing, [sic] I will, or can do, for you." (Rex Aff. at 2.) He also stated he "suffered greatly from the assault was in great physical pain and was not looked over at all by the nurse as I was sitting in a chair. No physical or visual observation or an examination table was even attempted to asses[s] injuries." *Id.* (alteration added).

At some point after the November 7, 2006, booking, jail officials transferred Rex to Daviess/DeKalb County Regional Jail in Pattonsburg, Missouri, a facility Defendant contends is used to relieve excess inmate population at Polk County Jail. Defendant asserts the transfer occurred on November 17, as stated in a November 22 letter written to Munoz by Larry Hadley, the Daviess/DeKalb County Jail administrator. (Def.'s App. at 17.) Rex, in contrast, testified that he was "shipped out to [Daviess/DeKalb] County Jail, first thing [the morning of the November 7 booking]. Plaintiff was sent by the next shift under the instructions of the Supervisor to hide the plaintiff from Polk County Officials." (Rex. Aff. at 2 (alterations added).) Rex stated he was sent to the Daviess/DeKalb County Jail "with an (old book-in photo) to cover up the current and noticeable injuries." *Id.* (parentheses in original).

According to Hadley, when Mary Morrow, Daviess/DeKalb County Jail's booking officer, asked Rex if he had any current injuries or illnesses, Rex said "he had no illnesses or injuries at the time." (Def.'s App. at 17.) Rex signed an Inmate Medical Information form, dated November 17, that stated, "I further acknowledge that I have previously disclosed any and all present and past medical illnesses and injury during the booking process." *Id.* at 25. Morrow stated on the form that Rex had no recent physical injuries, and he needed a bottom bunk because of a "bad knee." *Id.*

On November 20, 2006, Rex filled out an inmate request form in the Daviess/DeKalb County Jail, stating, "I was assaulted by the Sheriff Supervisor at the [Polk] County Jail the night I was booked in. I have since suffered a progression of severe headaches and neck with [sic] still after 2 weeks I have a bruise on my right eye and right shoulder." *Id.* at 14 (alterations added).

In a November 21, 2006, memo to Hadley, a jail nurse wrote that Rex had stated, "Polk Co. police had beat him up when they arrested him." *Id.* at 13. The nurse noted Rex had "[n]o red marks, scrapes, or discoloring of skin at time of visit." *Id.* (alteration added).

On November 22, 2006, after Hadley called Munoz and told him of Rex's complaint, Munoz had Rex returned to the Polk County Jail. The same day, Rex filed an inmate grievance concerning his November 7 booking. He wrote, "I was uncomfortable with [Long's] hands pressing down on my shoulder and lost my balance backwards and he grab[b]ed me by the cuffs[,] picked me up in the air and dropped me on my face and right shoulder with all my body weight. [H]e and another deputy tortured me and arched my back." *Id.* at 15 (alterations added). Rex stated he "was seen by the nurse" and that he was "seeking medical attention elsewhere." *Id.* Munoz investigated the grievance, and on December 18, he wrote to Rex, "In reviewing tapes and talking to Officers, your complaint is unfounded. . . . Your complaint about your injury, please consult with your attorney and Des Moines Police who arrested you." *Id.* at 8.

At some point, officials transferred Rex to Bridewell Detention Facility in Bethany, Missouri.[4] On December 29, 2006, Rex filed another inmate grievance, stating, "now I'm grieving you [Munoz] for not complying with investigative procedures! You did not interview me/nor review the tape with me/nor did you provide names of those involved/nor question 4 of my codefendants who were all present during the assault." *Id.* at 9 (alteration added). Rex added, "I have a blood clot spot in eye from this assault it has been noted here at Bridewell." *Id.* at 10.

From Bridewell, Rex wrote Polk County Sheriff Dennis Anderson an undated letter complaining about Munoz's investigation of his grievance. Rex enclosed his grievances alleging he was assaulted during booking, and he stated officers used an old book-in photo as a "cover up" to "avoid my cuts and facial bruise." *Id.* at 11. Rex wrote, "I have a blood clot stigma in . . .

---

[4] Bridewell houses excess inmate populations from surrounding counties and states. Bridewell Detention Facility, Home, http://bridewelldetention.com/default.aspx (last visited Apr. 29, 2009).

(my right eye.)  It has been on log with medical and this is due to the *assault*."  *Id.* (emphasis in original.)

In January 2007, at Munoz's request following Rex's complaint that the officer had not adequately reviewed his excessive force complaint, Polk County detectives began investigating Rex's allegations concerning the November 7, 2006, booking.  *See id.* at 26-34.

At some point, officials transferred Rex back to Polk County Jail.  According to Porter, the medical staff's next contact with Rex, after the November 7, 2006, booking incident, occurred on January 5, 2007, when Rex "kited (sent written message) medical for heartburn and back pain; he was given Ibuprofen and referred to the doctor."  (Porter Aff. at 1.)  On January 9, Rex saw Dr. Brewer and stated he had a broken blood vessel in his right eye, but the doctor saw only a slight infection of one vessel.  Rex saw Dr. Brewer again on January 11, and stated he was "finally getting over" his neck pain.  (Def.'s App. at 144.)  He complained of soreness in his shoulder muscles, and "tearing right eye."  *Id.*  The doctor diagnosed the shoulder problem as strain, and concerning the right eye, recorded "nothing seen."  *Id.*  Porter stated Rex received medication for the strain, and staff started logging Rex's activities.  The activity log from January 11 through 18 showed Rex "squatting, getting up and down from the top bunk, walking and sitting without difficulty."  (Porter Aff. at 1.)  Rex was referred to Dr. Overton for osteopathic manipulation, and he received manipulation treatment from the doctor on January 12 and 19.

On February 13, 2007, Rex sent a letter to Munoz stating, "But right now more than anything that is most important is the medical treatment needed to further my healing process." (Def.'s App. at 102.)  Rex complained about several medical issues:  "my pain meds ended on 6 February 2007"; "[d]uring shuffled transport I have had up to a 3 day lapse in medication"; "I suffered from deep depression because of personal and added pressure on my health"; "I'm in pain everyday"; "I have limited range of motion turning my neck to the right"; "muscles in my shoulder . . . tense on the right side"; "[m]y wedding ring finger on my right hand goes numb"; and "when I move [or] push or pull heavy . . . objects feels like a bones [sic] going to shoot out my shoulder."  *Id.* at 102-102A (alterations added).  Rex also said he was told "that the Doctor here at Polk County is done with treatment or his manipulation.  If he can't help me (anymore) *can there be a further step*?"  *Id.* at 102A (parentheses and emphasis in original).  Rex asked

Munoz to "[p]lease see into my medical treatment . . . . help see that my problem gets followed through." *Id.* (alteration added).  On February 14, 2007, Munoz responded to Rex in writing: "I will make sure that the Medical Administrator (Tania Porter) is aware of this complaint.  She will be able to answer your medical questions and concerns." *Id.* at 94 (parentheses in original). Rex saw medical staff the following day, February 15.  *See id.* at 140, 148 (Physician's Orders and Interdisciplinary Progress Notes from February 15, 2007).  No evidence indicates that Munoz received any further medical complaints from Rex.

On March 21, 2007, the detectives investigating Rex's allegations concerning November 7, 2006, reported to Munoz that Rex's allegations were unsubstantiated.  (Def.'s App. at 26.)  During their investigation, the detectives had viewed the video recordings of the booking, and they interviewed the booking officer, another officer present at the booking, Long, and Rex.  The detectives reported that concerning his injuries, Rex told them he had received medical treatment for a bruised sternum, and he had "partial vision problems with his right eye and whip lash." *Id.* at 28.  The inmate said he had received "muscle relaxer medication" for his injuries, but did not receive the medication until January 2007.  *Id.*  According to Rex, he went without medication "on several occasions while being shuffled between the jails in Pattensburg, Bethany, and Polk County." *Id.*

Munoz testified in his affidavit that after receiving the investigators' report, he viewed the video and found that it supported the reports of Long and the investigators.  The officer also "had checked into Mr. Rex's medical condition and found no support for his report of an injury, at least not a serious injury requiring treatment for anything beyond a superficial red mark above his right eye." (Munoz Aff. at 1.)

According to Rex, Long's use of force caused him "great physical pain." (Rex Aff. at 2.) Rex stated that Long's use of force caused him "continued back problems, broken blood vessel in the right eye and extreme migraine head-aches [sic] along with a black bruise that was visible for over 26 days on the plaintiff's right shoulder." *Id.*  Rex testified he has "had problems . . . up to this current date and have continued extreme pain while on prescription medications from the physical impairments still on going." *Id.*  Rex maintains that he "has still not been evaluated or taken to a specialist for these on going problems." *Id.*

The medical record shows Rex saw jail medical staff for various reasons approximately twenty times from November 7, 2006, to April 12, 2007. Rex was discharged from Polk County Jail in 2008.

The parties agree that Munoz had no personal contact with Rex at any time.

## CONCLUSIONS OF LAW

**I.     Excessive Force**

Rex claims that the "two unidentified Deputies and Victor Munoz['s] actions and inactions" violated his Fourth Amendment right not to be subjected to excessive force during an arrest. (2d Am. Compl. at ¶ 14 (alteration added).)

The Fourth Amendment's prohibition of unreasonable search and seizure applies to the use of excessive force during the booking process. *Wilson v. Spain*, 209 F.3d 713, 715-16 (8th Cir. 2000); *Moore v. Novak*, 146 F.3d 531 (8th Cir. 1998). When analyzing whether an officer used excessive force in violation of the Fourth Amendment, courts apply an "objective reasonableness" standard, and must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Scott*, 550 U.S. at 381, 383 (citing *Graham v. Connor*, 490 U.S. 386, 388 (1989)); *see also Mann v. Yarnell*, 497 F.3d at 822, 825-26 (8th Cir. 2007) (applying a reasonableness standard). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, . . . violates the Fourth Amendment." *Graham*, 490 U.S. at 396 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). As a supervisor, Munoz may be held individually liable under § 1983 "if he directly participates in the constitutional violation or if he fails to train or supervise the subordinate who caused the violation." *Brockinton v. City of Sherwood, Ark.*, 503 F.3d 667, 673 (8th Cir. 2007); *accord Vaughn v. Greene County*, 438 F.3d 845, 851 (8th Cir. 2006).

Defendant alleges the governmental interest justifying Long's use of force was maintenance of safety and security. The Court finds that Rex's version of the facts that give rise to his excessive force claim is directly contradicted by the booking videos, "so that no reasonable jury could believe it." *See Scott*, 550 U.S. at 380. For example, the videos show that Long, and/or other deputies, did not "flip the plaintiff into the air" or use "his knee for a weapon to inflict additional force," and Rex did not receive "further blows from the defendants including

12

twisting and pummeling of his extremities," as Rex contends. (Rex Aff. at 1-2; Statement Disputed and Undisputed Facts Supp. Res. Summ. J. at ¶ 4.) Rather, the videos shows Rex was not complying with the officer's instructions during booking, and that Long's use of force was measured, brief (less than 12 seconds), and appropriate. When Rex became compliant, the officer ceased using force. Accordingly, the Court will adopt the videos as fact rather than Rex's version. *See Marvin*, 509 F.3d at 239.

The Court finds the videos show the amount of force applied to Rex was reasonable under the circumstances. *See Mann*, 497 F.3d at 826 (finding use of canine in a bite and hold maneuver was not unreasonable use of force when plaintiff did not comply with officers' instructions and warnings during arrest); *Janis v. Biesheuvel*, 428 F.3d 795, 798, 800 (8th Cir. 2005) (during traffic stop, plaintiff failed to pull over and exit vehicle pursuant to officers' orders; court found use of force to pull driver out of vehicle was reasonable; it was "measured, brief, and appropriate to accomplish the purposes of the stop").

Because Rex did not "substantiate his allegations with sufficient probative evidence that would permit a finding in his favor . . . without resort to speculation, conjecture, or fantasy," he cannot withstand the Motion for Summary Judgment in regards to his claim that deputies used excessive force against him during the booking process. *Reed*, 561 F.3d at 790. Munoz cannot be found individually liable for participating in the alleged constitutional violation, because the summary judgment record shows there was no constitutional violation based on excessive force. *See Brockinton*, 503 F.3d at 673; *Vaughn*, 438 F.3d at 851. Furthermore, even if Long's or another deputy's conduct was unconstitutional, Munoz may not be held liable for that conduct under a theory of *respondeat superior*. *See Ashcroft v. Iqbal*, No. 07-1015, slip op. at 11-12 (U.S. May 18, 2009) (stating that government officials may not be held liable for their subordinates' unconstitutional conduct under a theory of *respondeat superior*; noting that vicarious liability is inapplicable to suits filed pursuant to *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971) and 42 U.S.C.§ 1983).

The Court finds that no genuine issues of material facts are in dispute, and Defendant is entitled to summary judgment as a matter of law. The Court respectfully recommends that Defendant's Motion for Summary Judgment be granted on the excessive force claim.

**II.     Deliberate Indifference to a Serious Medical Need**

Rex claims he "was injured by the Deputies, yet no medical care was provided." (2d Am. Compl. at ¶ 11.) He further claims he filed a grievance concerning denial of medical care, but Munoz "investigated that grievance and denied that grievance even though Mr. Rex had not received any medical assistance." *Id.* at ¶ 13. Rex does not specifically identify the grievance on which he bases his claim.

In challenging Rex's claims, Munoz asserts, "Plaintiff had no serious injury requiring medical attention but he was afforded medical care repeatedly for his medical condition over which he complained." (Def.'s Mem. Supp. Mot. Summ. J. at 15.) In resistance, Rex does not address Defendant's challenge to his claim.

To prevail on his claim, which the Court construes as alleging deliberate indifference to his serious medical need, Rex must "allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see Vaughn v. Gray*, 557 F.3d 904, 909 n.4 (8th Cir. 2009) (stating deliberate indifference is appropriate standard for pretrial detainees); *Hatfield v. Colborne*, 491 F.3d 394, 396 (8th Cir. 2007) (same). The standard includes both an objective and a subjective component; a plaintiff must show, "he suffered from one or more objectively serious medical needs, and that prison officials actually knew of but deliberately disregarded those needs." *Hatfield*, 491 F.3d at 397 (alteration added); *accord Vaughn*, 557 F.3d at 908; *Jones v. Minn. Dept. of Corr.*, 512 F.3d 478, 481 (8th Cir. 2008); *Butler v. Fletcher*, 465 F.3d 340, 345 (8th Cir. 2006). For purposes of analyzing this Motion, the Court will assume, without deciding, that Rex can satisfy the objective component.

To prove the subjective component, Rex must show that Munoz was "aware of facts from which the inference could be drawn that a substantial risk of serious harm" existed, and that the officer "actually drew that inference." *Mason v. Corr. Med. Serve.*, 559 F.3d 880, 885 (8th Cir. 2009) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)); *accord Hatfield*, 491 F.3d at 396-97. Deliberate indifference requires something more than gross negligence or disagreement with treatment decisions." *Ambrose v. Young*, 474 F.3d 1070, 1076 (8th Cir. 2007) (quoting *Farmer*, 511 U.S. at 835); *Jones*, 512 F.3d at 482. As a supervisor, Munoz may also be liable for his inaction. *See Melo v. Bachmeier*, 302 F.3d 845, 849 (8th Cir. 2002) (stating "a supervisor is

only liable . . . 'when the supervisor is personally involved in the violation or when the supervisor's corrective inaction constitutes deliberate indifference toward the violation'") (quoting *Boyd v. Knox*, 47 F.3d 966, 968 (8th Cir. 1995)).

The summary judgment record shows Munoz was not personally involved in the alleged denial of medical care for the following reasons: Munoz was not responsible for providing medical treatment; he relied on the opinions of medical staff; the officer did not deny Rex's medical treatment; and Munoz did not interfere with the inmate's medical treatment. *See Melo*, 302 F.3d at 849 (finding medical services director was not personally involved, when she was not responsible for providing medical treatment, relied on the opinion of prison doctors, did not deny medical care, and did not interfere with medical treatment). Moreover, the Court finds that Munoz acted reasonably in response to Rex's allegations of injury stated in his grievances on November 22 and December 29, 2006, and in his February 13, 2007, letter. Munoz reviewed Rex's medical record and spoke with Porter, the medical administrator, concerning the inmate's complaint. The record does not indicate that Rex submitted any further medical complaints to Munoz after February 13, 2007. The Court finds that Rex has not provided sufficient evidence to raise a genuine issue of material fact indicating that Munoz actually drew the inference that a substantial risk of serious harm existed. *See Mason*, 559 F.3d at 885.

The Court finds that no genuine issues of material facts are in dispute, and Munoz is entitled to judgment as a matter of law. Accordingly, the Court respectfully recommends that Defendant's Motion for Summary Judgment be granted on Rex's claim of deliberate indifference to a serious medical need, and that Rex's claims against Munoz be dismissed.

### III.     Failure to Adequately Process a Grievance

Rex alleges he "filed a grievance pursuant to the policies of the Polk County Sheriff's Office," raising "issues concerning both the use of force and denial of medical care," but that Munoz "investigated that grievance and denied that grievance even though Mr. Rex had not received any medical assistance." (2d Am. Compl. at ¶¶ 12-13.) Munoz asserts he is entitled to summary judgment on Rex's claim concerning his investigation and denial of his grievance. Rex did not address this issue in his Resistance.

Munoz's alleged failure to adequately process Rex's grievance, without more, is not actionable under § 1983. *Buckley v. Barlow*, 997 F.2d 494, 495 (8th Cir. 1993) (concluding

inmate's complaint failed to state a claim because no constitutional right was violated by the defendants' failure, if any, to process all the grievances the inmate submitted; stating a prison's "grievance procedure is a procedural right only, it does not confer any substantive right upon the inmates"); *accord Taylor v. Edelman*, 250 Fed. Appx. 187, 188 (8th Cir. 2007).

Viewing the record in the light most favorable to Rex, the Court finds that no genuine issues of material fact are in dispute, and summary judgment is appropriate on this claim. The Court respectfully recommends that Defendant's Motion for Summary Judgment be granted and that Rex's claim against Munoz be dismissed.

## IV. Qualified Immunity

Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, ___U.S.___, ___, 129 S. Ct. 808, 815 (2009) (citation and internal quotation omitted); *accord Engleman v. Murray*, 546 F.3d 944, 947 (8th Cir. 2008). Because the Court found that the allegations and undisputed facts do not make out a violation of a constitutional right, the Court need not analyze the second step of the qualified immunity analysis – whether the right was clearly established. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."); *Nelson*, 533 F.3d at 963 (stating when "allegations and undisputed facts do not amount to a constitutional violation . . . we do not need to inquire further regarding qualified immunity") (citation omitted).

## RECOMMENDATION AND ORDER

IT IS RESPECTFULLY RECOMMENDED that Defendants' Motion for Summary Judgment (Clerk's No. 20) be **granted** for the reasons discussed above, and that Plaintiff's claims against all Defendants be dismissed.

IT IS ORDERED that the parties have until June 10, 2009, to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. *Thompson v. Nix*, 897 F.2d 356, 357 (8th Cir. 1990); *Wade for Robinson v. Callahan*, 976 F. Supp. 1269, 1276 (E.D. Mo. 1997). The Court will freely grant such extensions. Any objections filed must identify the specific portion of the Report and Recommendation and relevant portions

of the record to which the objections are made and must set forth the basis for such objections. *See* Fed. R. Civ. P. 72; *Thompson*, 897 F.2d at 357. Failure to timely file objections may constitute a waiver of a party's right to appeal questions of fact. *Leonard v. Dorsey & Whitney*, 553 F.3d 609, 620 (2009); *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Griffini v. Mitchell*, 31 F.3d 690, 692 (8th Cir. 1994); *Halpin v. Shalala*, 999 F.2d 342, 345 & n.1, 346 (8th Cir. 1993); *Thompson*, 897 F.2d at 357.

    IT IS SO ORDERED.

    Dated this 19th day of May, 2009.

                                                      CELESTE F. BREMER
                                                      UNITED STATES MAGISTRATE JUDGE